UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

Kourtney D. Dainty,          )
                             )
    Plaintiff,              )
                             )
v.                           )    No. 14 CV 50217
                             )    Magistrate Judge Iain D. Johnston
Carolyn W. Colvin, Acting    )
Commissioner of Social Security, )
                             )
    Defendant.              )

## MEMORANDUM OPINION and ORDER

Plaintiff Kourtney D. Dainty brings this action under 42 U.S.C. §405(g), challenging the denial of social security disability benefits. As explained below, the case is remanded.

## BACKGROUND

On January 8, 2011, plaintiff filed Title II and XVI applications for disability benefits and supplemental security income. The following impairments were initially identified: polyarthralgia, elevated ESR,[1] pleurisy, back pain, Achilles tendinitis, gastroesophageal reflux disease, and endometriosis. R. 147. After her application was filed but before the hearing, plaintiff identified fibromyalgia as another condition causing her problems. *See* Ex. 14E. This condition is the focus of the present appeal.

---

[1] According to the Mayo Clinic website, ESR stands for erythrocyte sedimentation rate, which "is a blood test that can reveal inflammatory activity in your body," but is not "a stand-alone diagnostic tool."

1

On February 6, 2013, a hearing was held before the administrative law judge (ALJ). Plaintiff was then 28 years old. Plaintiff testified first in response to questions posed by the ALJ. She testified as follows. Plaintiff had finished a year or two of college. She had a driver's license and drove one day out of the week, usually to a store in the area. She was wearing a TENS unit, which is a device to treat pain through electrical stimulation beneath the skin. She obtained the unit in 2010 and used it every day. She lives with her children, a 10-year old and 4-year old, at her sister's house. She is not able to work due to pain "[a]ll over." R. 31. She has been unable to work for about three years and the pain has "gotten worse" over this time. *Id.* The pain is worse after long periods of standing, sitting, or walking. She can only do a household activity, such as washing dishes, for five to ten minutes before having to stop and take a breath.

Plaintiff further testified as follows. On a typical day, plaintiff helps her children get ready for school and does "maybe some light cleaning around the house." R. 33. Plaintiff's sister helps with the kids and does the majority of the other work around the house. The sister takes plaintiff's daughter to school, picks her up, prepares the children's meals, and gets them ready for bed. Plaintiff normally spends her day resting. At home, plaintiff switches positions throughout the day, but mostly lies down because standing and sitting increase the pain. She can stand about 10 to 15 minutes. She cannot walk a block and can sit 20 to 30 minutes without having to move. She never uses public transportation, and does not lift anything because of back pain. She can make her bed but does not do so very often. She can put dishes in the dishwasher, but cannot do laundry or grocery shopping. She generally does not leave home and does parent-teacher conferences by phone. She receives food stamps and has a medical card.

The ALJ only asked plaintiff a few questions about her doctors. The ALJ asked whether Dr. Mundwiler was plaintiff's rheumatologist and why she stopped seeing him. Plaintiff stated

that she was "[u]nable to make appointments." R. 36. The ALJ then asked plaintiff who ordered her recent physical therapy at Swedish American Hospital. Plaintiff stated that it was Dr. Larry Sy, her primary physician. The ALJ questioned plaintiff whether she was still seeing Dr. Sy and plaintiff stated that she saw him a month or two previously. The ALJ noted that Dr. Sy was prescribing Gabapentin. Plaintiff added that she had also taken Tramadol, Flexeril, Trazodone, and Zanaflex. R. 38. The ALJ asked about a reference in Exhibit 11E that plaintiff could not afford the copays for doctor visits and for medications and whether plaintiff had been getting her prescription medication "on a regular basis." *Id.* Plaintiff answered "no."

Plaintiff's representative then asked her questions. Plaintiff testified that she has difficulty going up or down stairs and was moving to a handicapped-accessible apartment. Her biggest problem was "[a]ll over pain." R. 42. Her back problems had been diagnosed as "a compression fracture, a bulging disk, and spinal stenosis," and she has "sinus tarsi syndrome in [her] left foot." R. 42. The syndrome causes pain, and her leg tends to give out on her. To alleviate the pain, she gets up and moves around the house and takes her medications. Hot showers also help. On May 23, 2013, the ALJ issued his opinion, finding plaintiff not disabled. The ALJ found that plaintiff had the severe impairments of fibromyalgia, T12-L1 disc herniation, and obesity. The ALJ found that plaintiff did not meet a listing. In the residual functional capacity ("RFC") analysis, the ALJ found that plaintiff had the ability to do light work with certain restrictions. The ALJ's reasoning is discussed below.

## DISCUSSION

A reviewing court may enter judgment "affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). If supported by substantial evidence, the Commissioner's factual findings are

3

conclusive. Substantial evidence exists if there is enough evidence that would allow a reasonable mind to determine that the decision's conclusion is supportable. *Richardson v. Perales*, 402 U.S. 389, 399-401 (1971). Accordingly, the reviewing court cannot displace the decision by reconsidering facts or evidence, or by making independent credibility determinations. *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008).

However, the Seventh Circuit has emphasized that review is not merely a rubber stamp. *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002). A reviewing court must conduct a critical review of the evidence before affirming the Commissioner's decision. *Eichstadt v. Astrue*, 534 F.3d 663, 665 (7th Cir. 2008). Even when adequate record evidence exists to support the Commissioner's decision, the decision will not be affirmed if the Commissioner does not build an accurate and logical bridge from the evidence to the conclusion. *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008). Moreover, federal courts cannot build this logical bridge on behalf of the ALJ or Commissioner. *See Mason v. Colvin*, 2014 U.S. Dist. LEXIS 152938, at *19 (N.D. Ill. Oct. 29, 2014).

On appeal, plaintiff raises several arguments, but they all revolve around her larger assertion that the ALJ erred in analyzing her fibromyalgia. As plaintiff notes, the two state agency physicians who the ALJ relied on never considered the possibility that she had fibromyalgia. Also, the ALJ did not call an impartial medical expert. As a result, plaintiff argues, the ALJ mostly played doctor in his comments about plaintiff's fibromyalgia. This Court agrees that the ALJ inadequately analyzed this issue.

The ALJ addressed plaintiff's fibromyalgia at several points during the five-step process. At Step Two, the ALJ concluded that plaintiff's fibromyalgia was a severe impairment. R. 12. However, the ALJ gave no explanation for this conclusion.

4

At Step Three, the ALJ found that plaintiff did not meet or equal any listing. Here, the ALJ stated the following about plaintiff's fibromyalgia:

> Fibromyalgia SSR 99-2p, evaluating chronic fatigue syndrome (CFS), requires clinically documented signs over a period of at least six consecutive months with: palpably swollen or tender lymph nodes on physical exam; non-exudative or pharyngitis; persistent reproducible muscle tenderness on repeated exams, including the presence of positive tender points.

R. 13. This is the complete discussion—in other words, the ALJ did not analyze the 99-2p requirements, or even clearly state that plaintiff did not meet them, although the clear implication is that she did not. Why she did not is unstated.

In the RFC analysis, the ALJ summarized the medical evidence in a loose chronological fashion, describing plaintiff's visits to a series of doctors from 2010 to 2012. These doctors, who had different specialties, addressed an assortment of symptoms and ailments affecting different body parts or systems. Interspersed in this discussion are several critical (and cryptic) comments questioning the seriousness of plaintiff's fibromyalgia and even, at times, raising doubts about whether plaintiff truly had fibromyalgia.[2] The central theme was that plaintiff only sporadically sought treatment.

The first reference to fibromyalgia arose out of the ALJ's observation that plaintiff's then rheumatologist, Dr. Matthew L. Mundwiler, referred plaintiff in 2010 to an orthopedist, Dr. Ryan Enke, to treat possible spinal problems. The ALJ viewed this referral as a telling sign. Here is the reasoning:

> That the claimant was seeing an orthopedic specialist at the request of a rheumatologist would tend to indicate that the rheumatologist could not account for the claimant's symptoms from the viewpoint of rheumatology. Therefore, the

---

[2] Doubting whether Plaintiff had fibromyalgia at this stage is odd. The ALJ already determined plaintiff was severely impaired by fibromyalgia. This type of analytical incongruity (which is littered throughout he ALJ's decision) may be explained by the fact that the ALJ did not write the decision. Instead, a "decision writer" drafted the decision. HALLEX I-2-8-20.

5

rheumatologist was seeking an orthopedic explanation, which implies that
fibromyalgia was not as limiting as seemingly suggested.

R. 17. Rheumatology, as the ALJ later noted in the opinion, is the specialty generally associated with treatment of fibromyalgia. R. 19.

The next reference was in the following passage where the ALJ acknowledged that Dr. Mundwiler found that plaintiff had 18 out of 18 tender points, which (as discussed below) is one of the diagnostic criteria sometimes used to evaluate fibromyalgia. However, strangely, the ALJ then seemed to discount the significance of Dr. Mundwiler's finding:

> Dr. Mundweiler [sic] clinically had identified as many as 18/18 positive tender points but no specific synovitis joint inflammation (2F/59, 8F/8). He also had noted a consistently elevated sedimentation rate, which is a marker of non-specific inflammation (2F/57). It indicates that inflammation is present, but identifies no specific medical etiology or cause. Dr. Mundweiler [sic], the rheumatologist, last appears to have seen the claimant approximately two years ago in April of 2011 (8F/8), *which begs the question of whether fibromyalgia has persisted, or whether it is a severe medical impairment*.

R. 17 (emphasis added). Again, questioning whether plaintiff's fibromyalgia was "severe" at this stage of the analysis is very curious in light of the previous finding that it was, in fact, severe.

The third reference was in the following paragraph where the ALJ accused plaintiff of making a "material contradiction" in how she described her physical limitations:

> Dr. Enke, the treating orthopedic specialist, elected to inject the spine (2F/91), but encouraged the claimant to perform regular home exercises (2F/14). For her part, the claimant indicated that any movement produced 6/10 pain (2F/ 16). She felt most comfortable sitting. Her worst posture was lying down, which is notable because at the hearing, she testified that she spent most of the day lying down. The latter is a material contradiction tending to indicate that the claimant is not able to provide accurate and specific detail, and that her impairments reasonably would not be expected to cause symptoms of the intensity, frequency, and restrictiveness that she asserts. This material conflict bears upon information that the claimant provided in December 2010, when she asserted that fibromyalgia was extremely limiting, and that she was rarely comfortable (2F/23).

6

R. 17-18.

The fourth reference was in the description of plaintiff's treatment in 2012 with Dr. Larry Sy. Here again, the ALJ seized on the fact that plaintiff's primary physician referred her to another doctor to treat a specific ailment. In this case, it was ankle problems. The ALJ stated the following:

> Dr. Sy referred [plaintiff] to a podiatrist who noted that the claimant now was using a cam walker (12F/14). Over a five-month interval, between March 2012 and August 2012, the next to last treatment visit, with podiatrist Edmond Mertzenich, DPM, was the only physician to see the claimant (12F/6-14), going to the likelihood that fibromyalgia was not the restrictive pain disruptor that the claimant asserted. Her chief focus now was her ankle, but by the last visit, Dr. Mertzenich inferred that etiology of her discomfort was her back.

R. 18. The ALJ then noted that, "[f]rom a podiatric perspective, Dr. Mertzenich offered no medical etiology to explain these symptoms," and that plaintiff then returned to Dr. Sy for ongoing treatment. *Id.*

The last two references are in the following passage where the ALJ summarized his earlier findings and also referred to a new Social Security regulation pertaining to fibromyalgia:

> Considering the foregoing, the claimant has severe impairments, but has not adequately demonstrated that fibromyalgia, obesity, or a T12 congenital deformity with disc herniation produces greater limitation than that assessed by the non-examining State agency medical consultants (6F, 7F, 9F). The subspecialty most closely corresponding with fibromyalgia is rheumatology. That field sets the criteria for its diagnosis, evaluation, and treatment, as acknowledged under SSR12-2p.
>
> Notwithstanding, the fact that the claimant did not follow with a rheumatologist or an orthopedic specialist with any regularity over most of the past two years tends to provide insight into the absence of restriction supported by this record. Simply establishing the impairment does not show by way of ongoing signs or findings that it remains present and limiting. As discussed above, the claimant did not pursue physical therapy until very recently, and she was not credible as far as the intensity, frequency, and restrictiveness of her asserted symptoms. She has a poor work

> history generally, not explained by fibromyalgia. She has not worked since 2006, and has only a single occupation that she performed for about a year as a phlebotomist. On balance, disability does not explain her extended intervals of unemployment, and she necessarily would have had to be more active in childcare than she acknowledges.

R. 19.

In considering all these comments, the Court finds that the ALJ relied too heavily on anecdotal observations untethered to any medical expert opinion. Consequently, the ALJ improperly "played doctor" in making judgments and assumptions about plaintiff's fibromyalgia. *See Moon v. Colvin*, 763 F.3d 718, 722 (7th Cir. 2014); *Rohan v. Chater*, 98 F.3d 966, 970 (7th Cir. 1996) ("ALJs must not succumb to the temptation to play doctor and make their own independent medical findings."). Moreover and critically, the ALJ failed to use the process and tests provided by Social Security Administration's own regulations. The Court begins with the latter point.

As an initial observation, the Court notes that the ALJ confusingly cited to two different social security rulings, referring first in the listing analysis to SSR 99-2p and then later in the RFC analysis to SSR 12-2p. No explanation was given for why the ALJ apparently decided to switch rulings mid-stream. SSR 99-2p governs the evaluation of chronic fatigue syndrome; whereas, SSR 12-2p governs the evaluation of fibromyalgia. The latter ruling became effective on July 25, 2012, and is the applicable regulation. *See, e.g., Kinard v. Colvin*, 2015 WL 2208177, *3 (N.D. Ill. May 7, 2015) (remanding because, among other things, the ALJ erred in analyzing plaintiff's fibromyalgia under SSR 99-2p rather than SSR 12-2p).

Putting this ambiguity aside, the ALJ never explicitly applied the requirements from either ruling. On remand, the obvious starting point for both the ALJ and the parties should be the procedures in SSR 12-2p, the Social Security ruling specifically governing fibromyalgia. The

ruling provides not only helpful background information about fibromyalgia, but also sets out the type of evidence a claimant must provide to show that she had the medically determinable impairment of fibromyalgia.

As stated in SSR 12-2p, fibromyalgia "is a complex medical condition characterized primarily by widespread pain in the joints, muscles, tendons, or nearby soft tissues that has persisted for at least three months." SSR 12-2p refers to general and specific criteria. In the "general criteria" section, the ruling states that a claimant can show that she has the medically determinable impairment of fibromyalgia by submitting evidence from a licensed physician who has reviewed the claimant's medical history and conducted a physical exam. The ruling states that the agency will "review the physician's treatment notes to see if they are consistent with the diagnosis of [fibromyalgia], determine whether the person's symptoms have improved, worsened, or remained stable over time, and establish the physician's assessment over time of the person's physical strength and functional abilities."

In the "specific criteria" section, the ruling describes two tests or criteria to establish fibromyalgia. One test is the 1990 American College of Rheumatology Criteria, which has these three requirements: a history of widespread pain in all quadrants of the body that has persisted for at least 3 months; at least 11 positive tender points out of 18 on physical examination; and evidence that "other disorders that could cause the symptoms or signs were excluded" (also referred to as "ruling out" other explanations). The other test is the 2010 ACR Preliminary Diagnostic Criteria, and it too has three requirements. The first and the third are the same as the first test. The second requirement, rather than relying on a tender point analysis, states that the claimant must show "[r]epeated manifestations of six or more [fibromyalgia] symptoms, signs, or co-occurring conditions, especially manifestations of fatigue, cognitive or memory problems

9

('fibro fog'), waking unrefreshed, depression, anxiety disorder, or irritable bowel syndrome." The ruling envisions that these tests will be used initially at Step Two in the assessment of whether a claimant's fibromyalgia constitutes a medically determinable impairment. Finally, the ruling contains a section addressing the situation in which there is "insufficient evidence" that a claimant's fibromyalgia qualifies as an impairment or whether it renders her disabled. This section states that the agency may take several actions to resolve the insufficiency, including recontacting the treating sources or requesting a consultative examination.

Here, although the ALJ mentioned SSR 12-2p at the end of the opinion, the ALJ clearly did not explicitly apply either of the two tests set forth therein. The State agency physicians, Dr. Arjmand and Dr. Andrews, did not even consider that plaintiff might have fibromyalgia and thus obviously did not analyze these tests either. *See* Exs. 6F, 7F, 9F.

It is true that the ALJ indirectly touched on some of these criteria in the roving RFC analysis, but the references are too vague to give the Court any assurance that the ALJ was even aware of the tests, much less applied them correctly. For example, the ALJ noted that Dr. Mundwiler found that plaintiff had 18 tender points, but the ALJ did not acknowledge that this was one of the criteria. Moreover, in the rest of the paragraph, the ALJ seemed to discount this finding. The ALJ noted that Dr. Mundwiler did not find any "specific synovitis joint inflammation," seemingly suggesting that joint inflammation should be present if plaintiff had fibromyalgia. R. 17. The ALJ also noted that there was other non-specific inflammation. However, plaintiff argues that the ALJ was mistaken on these points because inflammation is not a symptom of fibromyalgia. Dkt. #18 at 13. The authority for the latter assertion is based on a website cited by plaintiff. *Id.* Although the Court cannot now verify the latter assertion, the

Court notes that neither of the two SSR 12-2p tests refer to inflammation as being a requirement for diagnosing fibromyalgia.

In this same paragraph in which the ALJ acknowledged Dr. Mundwiler's finding that plaintiff had 18 tender points, the ALJ also noted that plaintiff had not seen Dr. Mundwiler for two years, stating that this "begs the question of whether fibromyalgia persisted." R. 17. This statement could be taken as an oblique reference to the one of the diagnostic criteria—namely, the first requirement in both tests that there be widespread pain persisting for at least three months. However again this reference is too attenuated to constitute a formal analysis of the SSR 12-2p tests. It also rests on an incomplete factual picture. Although plaintiff stopped seeing Dr. Mundwiler, for reasons that are not entirely clear, she was treated later by another doctor, Larry Sy. As plaintiff explained at the hearing, Dr. Sy had referred plaintiff at one point to a new rheumatologist, but this rheumatologist (Dr. Hovis) stated that Dr. Sy would be able to adequately treat plaintiff's fibromyalgia. R. 46. The ALJ did not consider this explanation when he found that plaintiff was no longer being treated for her fibromyalgia after April 2011.

Several of the ALJ's other fibromyalgia-related comments suffer from similar errors. First, the ALJ twice noted that plaintiff's doctors, who were then treating her for fibromyalgia symptoms, referred her to other doctors for treatment of specific ailments, such as spinal and foot problems. The ALJ believed that these referrals were implicit concessions that plaintiff did not have fibromyalgia or at least that it was not a serious problem. However, this inference is speculative, at best. For one thing, neither of the referring doctors ever stated that their referrals were because they doubted that plaintiff had fibromyalgia. And, in each case, after the referral, plaintiff returned to the primary doctor for continuing treatment. For another thing, the ALJ failed to acknowledge that it was during this general period that plaintiff was being diagnosed

with fibromyalgia. It is thus possible that these referrals were part of the rule-out process in which doctors were ensuring that there was not another explanation for plaintiff's various medical problems, a step required by both tests. For example, Dr. Mertzenich, the podiatrist, found no clear etiology to explain plaintiff's foot pain. The ALJ seemed to believe that this finding undermined plaintiff's credibility when, in fact, it could have been part of the ruling-out process which could lend support to the fibromyalgia diagnosis. There is no way of knowing this because the ALJ did not apply the appropriate regulation.

Second, the ALJ also mentioned several times that plaintiff had treatment gaps. However, as plaintiff explained, she had financial and other practical difficulties in seeking treatment, which could explain these gaps. She has alleged that she could not afford co-pays or medication, and had no vehicle to get to the doctor. *See* Dkt. #18 at 9-10. As the Seventh Circuit has noted, an ALJ cannot "rely on an uninsured claimant's sparse treatment history to show that a condition was not serious without exploring why the treatment history was thin." *Pierce v. Colvin*, 739 F.3d 1046, 1050 (7th Cir. 2014); *Craft*, 539 F.3d at 679 ("although the ALJ drew a negative inference as to Craft's credibility from his lack of medical care, she neither questioned him about his lack of treatment or medicine noncompliance during that period, nor did she note that a number of medical records reflected that Craft had reported an inability to pay for regular treatment and medicine."). Here, although the ALJ briefly asked plaintiff about co-pays at the hearing, the ALJ never further explored the issue nor mentioned it in the decision as a possible explanation for various alleged treatment gaps.[3]

---

[3] In its response brief, the Government concedes that the ALJ failed to consider plaintiff's explanations, but argues that this failure is harmless error because plaintiff's "treatment gaps were not due to her inability to pay." Dkt. #24 at 6. But the Court finds that the evidence cited by the Government is vague and not clear or convincing enough to justify the application of the harmless error doctrine. The better approach is to allow the ALJ to develop the record further regarding this issue and then to explicitly address it in a written decision.

Third, the ALJ criticized plaintiff for only attending five physical therapy sessions in the early part of 2010, asserting the following: "Dr. Mundwiler had noted that the claimant only followed through on five physical therapy sessions, which implies that she did not give this treatment modality an opportunity to work (2F/44)." R. 17. But the ALJ's summary is incomplete. The ALJ omitted that Dr. Mundwiler wrote in his treatment notes that the reason plaintiff only attended five sessions was because her sessions were "[i]nterrupted by other medical issues." R. 310. In other words, contrary to the impression suggested by the ALJ, Dr. Mundwiler did not state that plaintiff was stopping therapy for no good reason. Moreover, the ALJ's view that plaintiff was not willing to give physical therapy an opportunity is undermined by the fact, later noted in the opinion, that plaintiff tried physical therapy again in 2012, but it was not successful. R. 18 (noting that "physical therapy did not decrease her asserted symptoms").

The Government's main argument in response to all of the above is to assert that the ALJ did find that plaintiff's fibromyalgia was a severe impairment and did limit plaintiff to performing light work. Dkt. #24 at 3. The Government then notes that merely because plaintiff had fibromyalgia does not mean that it was severe enough to be disabling. These points are all true. However, the Court still finds that the ALJ's opinion failed to provide a clear or complete analysis of the fibromyalgia issue for the reasons already stated above.[4]

In remanding this case, the Court is not indicating that any particular result should be reached. Fibromyalgia is a difficult condition to assess, and the evidence in this case is not uniform. Ultimately, the ALJ will have to make a judgment about whether the pain from plaintiff's fibromyalgia is severe enough to prevent her from working. But to assess this

---

[4] The plaintiff raised a few other arguments, such as her claim that the ALJ ignored her obesity. Because the Court finds that the above arguments are sufficient to justify a remand, the Court need not address these additional arguments here, which in any event are similar to the arguments already discussed herein.

question, the ALJ should first follow the procedures and tests in SSR 12-2p and should seek an expert medical opinion or take other steps if that evidence is insufficient.

## CONCLUSION

For these reasons, plaintiff's motion for summary judgment is granted, the government's motion is denied, and this case is remanded for further consideration.

Date:  June 24, 2016                    By:  _____
                                             Iain D. Johnston
                                             United States Magistrate Judge